■ KATHERINE SAYER, Appellant, v IRWIN SAYER, Respondent.—Order, Supreme Court, New York County (Kenneth Shorter, J.), entered July 25, 1986, which, *inter alia,* denied defendant's motion to renew the plaintiff's prior application for pendente lite relief, affirmed, without costs. Appeal from the order, Supreme Court, New York County (Kenneth Shorter, J.), entered March 10, 1986, which granted plaintiff's motion for pendente lite relief to the extent of awarding plaintiff $100 per week temporary maintenance and $200 per week child support, and directing defendant to pay all carrying charges, mortgage payments and utilities on the marital residence, to maintain on behalf of the plaintiff and the parties' minor child all present policies of insurance and to pay certain medical expenses, and to pay the child's private school tuition, dismissed as superseded by the appeal from the order denying renewal without costs. *Sua sponte,* the Justice presiding in the IAS Part in which this action is pending is directed to schedule a trial to commence no later than June 15, 1987.

This case emphatically demonstrates the wisdom of the oft-

repeated maxim that the appropriate remedy for a dispute over a temporary award of maintenance, based as it is on conflicting and inadequate affidavits, is a prompt trial where the facts may be examined into in far greater detail and where a more accurate appraisal of the situations of the parties may be obtained. *(Getson v Getson,* 91 AD2d 540; *Braga v Braga,* 82 AD2d 727; *Woram v Gilliam,* 78 AD2d 796; *Rappeport v Rappeport,* 46 AD2d 756.) That is particularly so here where the parties have an eight-year-old child whose immediate future would be traumatically disrupted by summary imposition of the extreme reductions in the amount of pendente lite maintenance and child support proposed by the dissent, based solely upon papers which do not fully and accurately reflect the totality of the current economic circumstances of the parties. That the action, which was commenced in December 1985, is presently on the calendar awaiting trial further militates against imposing, at this juncture, sweeping, and possibly irreversibly harmful, appellate modifications.

While the dissent alludes to alleged "criticism" of the speedy trial rule, a reading of the authorities cited makes clear that they do not take issue with the long-settled rule that a trial, where realistic findings can be made on evidence rather than on conflicting self-serving affidavits, is the appropriate remedy for any perceived inequities in a temporary award of maintenance. *(See,* 11B Zett-Edmonds-Schwartz, NY Civ Prac, Matrimonial Actions § 38.02 [4].)

The discussions which are characterized by the dissent as "criticism" are, in fact, concerned with the ramifications of extended discovery proceedings in complex equitable distribution cases (11B Zett-Edmonds-Schwartz, NY Civ Prac, Matrimonial Actions § 38.02 [4]), particularly within the context of the statutory preference under Domestic Relations Law § 249 which "authorizes the court to direct that an action be placed upon the trial calendar 'forthwith' (even though no note of issue has been, or could properly be, filed)" (Scheinkman, Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C249:2). These concerns, of course, are wholly irrelevant to the instant case where discovery has been completed and a note of issue and statement of readiness have already been filed and the case has been on the calendar for several months.

Parenthetically, it may be noted that even in a case where a prompt trial will not be possible because of the need for protracted discovery, modification of the temporary award will not be granted where the precise financial status of the

parties is in doubt and the appropriate remedy is a denial without prejudice to renewal before the court in which the case is pending "after a more accurate appraisal of the financial situation of the parties has been obtained." *(Besen v Besen,* 94 AD2d 637, 638.)

While the dissent cites *Pieri v Pieri* (91 AD2d 1016) for the proposition that "the speedy trial rule is not ironclad", the precise statement made by the court in that case is instructive. That statement, in its entirety is as follows: "Although appeals from orders awarding temporary maintenance and child support are not to be encouraged and a speedy trial is the preferred remedy for resolving such issues *(Goldman v Goldman,* 45 AD2d 719; *Singh v Singh,* 41 AD2d 914), *the rule is not ironclad when the award is deficient (Brokaw v Brokaw,* 57 AD2d 519)." *(Supra,* at 1016-1017 [emphasis supplied]; *see also,* Byer, A Guide to Civil Motions in New York State Courts § 614 [9a], at 162 [1987 Supp], and cases therein cited.)

The underlying soundness of the principle which prefers a prompt trial, with its evidentiary resources, to appellate modifications, on unenlightening submitted papers, has been continually reaffirmed in this "age of equitable distribution" *(see, e.g., Lehman v Lehman,* 104 AD2d 546; *Belvin v Belvin,* 111 AD2d 546; *Bennett v Bennett,* 105 AD2d 1047; *Pleto v Pleto,* 98 AD2d 994; *Peters v Peters,* 100 AD2d 900; *Blasco v Blasco,* 99 AD2d 747) and application of this principle is particularly appropriate in this case.

The difficulties in making definitive valuations in the instant case stem from the substantial changes which occurred in the husband's business fortunes prior to the commencement of this action, the evolving status of his current business endeavors, the wife's lack of knowledge about his financial position and the husband's failure on the motion for temporary maintenance and child support to file a net worth statement as required by Uniform Rules for the New York State Trial Courts (22 NYCRR) § 202.16, ostensibly because he was proceeding *pro se,* although the record reflects that he had consulted and was in contact with legal counsel from the outset and that he had been advised in court of such requirement.

On that motion, Special Term awarded the plaintiff pendente lite relief in the amounts of $100 per week maintenance and $200 per week child support in addition to a direction that defendant pay all carrying charges on the marital residence, that he continue to maintain various policies of medical, and other insurance on behalf of the wife and child, pay

all unreimbursed nonelective medical expenses for them and pay the child's private school tuition and related expenses. In arriving at this determination, the court indicated that it had drawn an inference unfavorable to the defendant with respect to the financial issues raised in the application because of his failure to submit an "appropriate financial affidavit", citing 22 NYCRR 202.16 (g) (4) (i).

Shortly after this order was entered, defendant formally obtained counsel and moved for renewal, or alternatively, for downward modification of the award pursuant to Domestic Relations Law §§ 236 and 240. This time, defendant submitted a statement of net worth, in addition to an affidavit with respect to his financial circumstances, including information as to his current endeavors in the new business, Prosales, Inc., from which he indicated he was receiving a monthly draw of $4,333, or $3,453 after taxes, in addition to $2,000 a month as an office expense allowance while using the marital apartment as his office.

Plaintiff opposed the motion for renewal, contending that it was, in fact, one for reargument which contained no new facts which were unavailable to the court or defendant at the time of the original motion and that no valid excuse was offered for the failure to submit this material on the original motion. The motion was denied on these grounds.

We affirm the denial of renewal in this case both for the reasons given by the Justice in the IAS Part and because the papers submitted on the application for renewal, even if we were to consider them, would afford little assistance in enabling this court to set some alternatively realistic level of pendente lite maintenance. The husband acknowledged in his papers that in the short period between the original motion and the renewal application his income had increased from zero to a "draw" of $4,300 a month. While this demonstrated that his business endeavors were prospering and that the future augured well, we cannot accept without question, as does the dissent, that the defendant's ability to pay is circumscribed by the discretionary amount of the draw which he indicated he was receiving.

Realistically, it cannot be overlooked that the designation of the precise amount of the defendant's "draw" from the business may well be related to the pendency of the matrimonial action and his other litigations, and that an allowance for business or office business expenses, de hors such draw, also plays a significant role in defendant's over-all economic situa-

tion. Moreover, it is clear that defendant's acknowledged "draw" does not necessarily accurately reflect the income he is capable of earning given his business background and experience *(see, Kay v Kay,* 37 NY2d 632; *Williamson v Williamson,* 84 AD2d 606). Only a trial, of course, can adequately flesh out the realities of defendant's *full* abilities to meet the needs of his family.

We cannot agree that the record before us supports the drastic modifications of the award proposed by the dissent, which wholly fails to take into account the realistic basic needs of the wife and eight-year-old daughter. While it may well be, as Justice Wallach concludes, that it will ultimately be established that the apartment occupied by plaintiff and the child is "beyond the parties' means", the limited record before us composed of unilaterally supplied facts as to defendant's economic position, which plaintiff has had no real opportunity to realistically controvert, hardly provides the appropriate vehicle by which to summarily make that determination with its far-reaching and disturbing consequences, particularly to the child. Indeed, the recommended modifications effectively eliminate the need for a trial at all and would render meaningless any contrary conclusions that may actually be warranted on the basis of the evidence as to the husband's actual financial circumstances which is elicited at such trial.

As indicated, the only appropriate remedy here is an immediate trial. Since this matter was commenced 18 months ago and has been on the calendar awaiting trial since January 1987, and since the court rules make provision, where necessary, for matters requiring immediate disposition *(see,* Uniform Rules NY St Trial Cts [22 NYCRR] § 202.3 [c] [4]), the Justice presiding in the IAS Part in which this case is pending shall schedule the trial of this matter to commence no later than June 15, 1987. Concur—Kupferman, J. P., and Ellerin, J. Rosenberger, J., concurs with the majority memorandum and in a separate concurring memorandum and Sullivan and Wallach, JJ., dissent in a memorandum by Wallach, J., all as follows: Rosenberger, J. (concurring).

I concur with the majority memorandum, but feel there are parts of the dissent which warrant brief discussion.

The dissent states that the appellant, as a *pro se* litigant, showed considerable diligence and attentiveness to the lawsuit. It further "hesitate[s] to conclude * * * that he was

given an opportunity by the court to submit a net worth statement after being told of the consequences for failing to do so." In an affidavit, dated April 21, 1986, the defendant conceded that, at a conference held at court on February 26, 1986, the law assistant conducting the conference for the court "emphasize[d] the fact that I had not attached a separate form of net worth statement to my affidavit". On February 27, 1986, the next day, the defendant wrote a letter to the court dealing with other matters, but persisted in his neglect to file the required statement, the importance of which had been explained to him at court the preceding day.

I cannot place any weight, in these circumstances, on the defendant's alleged "pro se" status. Defendant consulted with counsel after receiving the initial motion papers in this case. That attorney, who later entered the case officially and is still representing the defendant, telephoned plaintiff's attorney within days after the service of the motion. He wrote to defendant's attorney two days after telephoning him and, while disclaiming appearing for the defendant, suggested a meeting with plaintiff's attorneys to "discuss the situation". Parenthetically, it bears noting that an examination of the papers reproduced in the record shows that the defendant's original "pro se" affidavit in opposition to plaintiff's motion bears a striking resemblance to those papers later submitted by defendant's counsel. All appear to have been typed on the same typewriter. The spacing, numbering of paragraphs, and other physical details of the "pro se" and by counsel papers appear identical.

As noted by the majority, a prompt trial is the proper forum for detailed examination into, and accurate appraisal of, the situation of the parties. Nothing approaching an accurate appraisal is possible on this record. Credibility is very much an issue. Some examples may be illustrative of the problem. The defendant consistently speaks of his "draw" of $4,333 per month. He has occasionally referred to the $2,000 per month he receives for office expense. He has, however, not maintained an office. Initially he worked from his home in New York. When he removed from the family apartment, he went to Philadelphia where office and residential facilities have been provided for him. His actual monthly income therefore has been almost 50% greater than that which he has alleged (and which the dissent has adopted). He has acknowledged that his daughter's tuition has been halved, to $3,600 per year, by her school. Yet his affidavits and sworn financial statement still claim $600 per month, double the amount

actually payable. These are but two of many possible examples.

The dissent maintains that the motion to dismiss the action pursuant to CPLR 3012 (b) should be held in abeyance pending hearing and findings by the trial court. It is acknowledged that a mere denial by the recipient that he ever received papers served by mail is insufficient to rebut the presumption of proper mailing (Engel v Lichterman, 62 NY2d 943 [1984]). In the instant case, the fact that the denial by the defendant of receipt of the originally mailed complaint is oft repeated should not serve to elevate it above the level of that which it is: a denial unsupported by more.

Wallach, J. (dissenting).

The majority begins with a reference to the "wisdom of the oft-repeated maxim that the appropriate remedy for a dispute over a temporary award of maintenance, based as it is on conflicting and inadequate affidavits, is a prompt trial where the facts may be examined into in far greater detail and where a more accurate appraisal of the situations of the parties may be obtained." Developed at a time when disclosure in matrimonial actions was available only on a limited basis (see, 11A Zett-Edmonds-Schwartz, NY Civ Prac, Matrimonial Actions § 35.02), this so-called speedy trial rule (see, 11B Zett-Edmonds-Schwartz, NY Civ Prac, Matrimonial Actions § 38.02 [4]) .has been criticized as losing much of its rationale in an age of equitable distribution and IAS Parts (see, 11C Zett-Kaufman-Kraut, NY Civ Prac, Equitable Distribution Actions § 70.02 [7]; Scheinkman, Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C249:2). However, I do not dissent because of reservations over the continued vitality of the speedy trial rule. Rather, I dissent because the speedy trial rule is not ironclad, and there will be cases where compelling circumstances warrant an appellate remedy when the award is excessive (see, Orenstein v Orenstein, 24 AD2d 753; Fisher v Fisher, 56 AD2d 547; Braga v Braga, 82 AD2d 727; Stewart v Stewart, 96 AD2d 939; Hill v Hill, 121 AD2d 270), just as there are when the award is deficient (see, Pieri v Pieri, 91 AD2d 1016). The instant case is an example.

The parties were married in February 1976, and had a daughter three years later. In December 1985, the wife commenced this action for divorce on the ground of cruel and inhuman treatment. In January 1986, she made a motion for temporary maintenance and child support, and for further specific financial relief including payment of the carrying

charges on the marital residence. The motion was supported by a net worth statement itemizing $9,500 a month in expenses, and an affidavit describing a "lavish lifestyle". This lifestyle included a two-bedroom cooperative apartment in Manhattan, a second home in East Hampton, New York (the carrying charges on these two properties accounted for $5,600 of the $9,500 total monthly expenses listed in the wife's net worth statement), a Jaguar automobile, a private school education for their six-year-old daughter, a full-time housekeeper in the Manhattan apartment, vacations, theatre and dining out. At the time the wife made this motion, the parties were still residing together in the Manhattan apartment, but the husband was becoming impossible to live with, and he was especially petty when it came to money. On one occasion, he made her give him the receipt for a $1.55 can of soup that she bought, and he would not give her any money for food at all unless she first gave him an "estimate" of the cost of the items she wanted to buy. He gave her no money "whatsoever for such basic things as subway fare, taxis, etc.", not to mention even more basic things like medical care. All she got from him was a flat $50 a week. Her situation had become particularly desperate as she needed periodontal surgery, which she had to postpone. Her only assets of significant value were the Manhattan apartment, with a fair market value of $710,000 but subject to encumbrances of $275,000, and the East Hampton house, with a fair market value of $170,000 and encumbered to the extent of $75,000 both of which properties she jointly owned with the husband. In addition, she had $2,000 in a savings account and $300 in a checking account. She never had a steady job outside of the home since getting married, although of late she had been working as a free-lance interior designer, earning $18,000 in 1985, but this "activity was more of a hobby than a job." Concerning the husband's financial circumstances, she said that he was "a successful businessman" who had started a "new business" which he told her was "doing well", and which "must be making headway" since he was spending more than 10 hours a day at his desk working out of the apartment. She also said that throughout the marriage the husband had always maintained a "wall of secrecy" about his finances. On several occasions he asked her to sign financial documents, but would fold the paper over so that only the signature line would show, saying: "when you make the money then you can see what you are signing." So furtive was the husband concerning his finances that the family disqualified itself from receiving

financial aid for the daughter's tuition because the husband would not release his 1984 tax return. In addition, he was "intentionally falling behind" in paying various household expenses, such as laundry and dry-cleaning bills. A footnote in her net worth statement indicated that the family automobile had been repossessed, but this curious circumstance was not explained in her affidavit.

The husband, appearing *pro se,* claimed that he was broke. He conceded that the parties did enjoy the lavish life-style described by the wife in her affidavit, but that in the fall of 1985, just prior to the institution of this action, the successful book distributorship business he had owned and operated "went down the tubes" leaving him heavily in debt. A judgment for $250,000 had recently been entered against him and the entry of another for $29,000 was imminent. Presently, he had no income at all, nor any assets other than the Manhattan apartment and East Hampton house co-owned with the wife. So severe was his financial failure that he was subsisting on loans from his father and brother who were helping him "to keep food on the table and a roof over our heads". He further stated that, backed by two other people who knew of his reputation in the book distributorship business, and working out of the Manhattan apartment, he was attempting to start up a new business, but so far he had not realized any income therefrom and probably would not for some time. Indeed, the only income coming into the family was that being earned by the wife, although he did not say how much. He called the wife a "rat jumping the ship" for having hired an expensive divorce lawyer on October 8, 1985, the very day on which the decision awarding the $250,000 judgment against him was handed down, as well as for having "used her own funds" to go to Italy on a two-week vacation, join a country club, and continue paying the housekeeper, all in the midst of his "financial disaster". His opposition to the wife's motion did not include a net worth statement.

The motion was returnable on February 6, 1986. On February 26, 1986, an off-the-record conference was conducted by a law assistant in connection with the motion. On March 10, 1986, the trial court rendered a written decision awarding the wife pendente lite relief of $100 a week maintenance and $200 a week child support, and further held the husband responsible for the carrying charges on the Manhattan apartment, maintenance of all existing medical, hospital and life insurance covering the wife and child, any unreimbursed nonelective medical expenses to be incurred by the wife and child,

and the child's private school tuition and "school related expenses". The court did not state how much these items amounted to in all, indicating only that, pursuant to 22 NYCRR 202.16 (g) (4) (i), it "ha[d] drawn an inference favorable to the [wife] with respect to the financial issues raised in this application" because of the husband's failure to submit an "appropriate financial affidavit".

Shortly after being directed in a subsequent order to move out of the Manhattan apartment, the husband, on May 23, 1986, moved for renewal or downward modification of this pendente lite award. Now an attorney was appearing on his behalf, and his motion was supported by a net worth statement, as well as an affidavit reiterating that at the time of the original motion he had no income whatsoever, and submitting promissory notes and canceled checks in the amount of $42,500 evidencing the loans from family members alluded to on the prior motion. His situation, however, had changed, in that his new business was now paying him a "draw" of $4,333 a month, or $3,453 after taxes. He stressed, however, that he had "no ownership interest whatsoever" in this "fledgling corporation", which had yet to show a profit, and that his income was simply not enough to meet what he had been ordered to pay. That amount, he represented, was $5,860 a month, not including the $690 a month ($7,200 for tuition plus transportation costs) he had already paid to send the child to private school for the academic year 1985-1986. Of this total, $4,370 a month represented the carrying charges on the Manhattan apartment. As long as he was using the apartment as an office as well as a residence, he was able to apply a $2,000 monthly "office allowance" his new business was paying him, in addition to the $4,333 monthly draw, towards the cost of the apartment; now that he was no longer living in the apartment, the office allowance could no longer be used in that way. Reminding the court that he now had his own, separate living expenses to meet since being directed to move out of the Manhattan apartment, he stated that he presently had no housing expense as his business associates were temporarily providing him with a place to live in Philadelphia because his presence there was required for business reasons while one of his associates was recovering from an illness. However, he anticipated having to return to New York in the near future where he would be required to obtain an apartment and an office, although he equivocated on whether his business associates would continue to supply him with funds for an office. He stated that he had already paid $7,200 to

cover the child's private school tuition for the present academic year, and that, having "pleaded severe financial hardship" to those in charge of the school, tuition for the following academic year would be only $3,600, or $300 a month more under the interim order. Thus far he had paid only $750 to his attorney, who was continuing to represent him without a definite fee agreement out of friendship. Besides the judgment for $250,000 mentioned on the prior motion, other lawsuits were pending against him, and the wife as well, to recover some $200,000 on various guarantees. The East Hampton house, with its $900 a month mortgage, had gone into foreclosure. His net worth statement indicated total assets of $436,150 (giving effect to one half of the value of the jointly owned real estate), and total liabilities of $909,514.94. Finally, he asserted that the wife was now making $500 a week at a job she started after the original support motion was made.

Against this, the wife submitted the affidavit of her attorney offering legal argument as to why renewal or modification should be denied. In a decision dated July 24, 1986, the court denied the motion on the grounds urged, namely, that the husband's papers contained no new matter that was not or could not have been submitted on the original motion, and that his proper remedy was a prompt trial.

It is clear that what the husband wished to accomplish on his motion to renew or modify was to have the court decide the wife's motion for temporary maintenance and support on the merits and not a technicality. It cannot be stressed too much, however, that the rules of the court governing financial disclosure are no mere technicality. Compulsory financial disclosure at an early stage of a matrimonial action is mandated by statute (Domestic Relations Law § 236 [B] [4]). The rules of the court, including the officially prescribed affidavit, were promulgated to implement that mandate (see, Scheinkman, Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C236B:19).

Nevertheless, infirmities in the trial court's pendente lite award make the husband's discontent therewith understandable. No reasons were given by the trial court for its decision other than its discretion under 22 NYCRR 202.16 (g) (4) (i) to draw inferences against a party opposing a pendente lite motion who fails to submit a net worth statement. This served neither to indicate which of any disputed financial facts or issues were, as the rule puts it, "affected by such failure", nor which of any so "affected" were deemed essential by the trial court to its decision (see, CPLR 4213 [b]). Greater discrimina-

tion is required in drawing inferences pursuant to this rule, for the inferences drawn, whatever they might be, must be stated. Just as it must do in making a final equitable distribution of the parties' property (Domestic Relations Law § 236 [B] [5] [g]), the court, in making an award of temporary maintenance (Domestic Relations Law § 236 [B] [6] [b]), or of temporary child support (Domestic Relations Law § 266 [B] [7] [b]), must set forth the reasons for its decision, with particular reference to the factors listed in the statute *(see, Stern v Stern,* 106 AD2d 631). There may be, as the majority notes, difficulties in arriving at "definitive valuations", but, difficult or not, some kind of valuation of the parties' financial worth must be made if the mandate of the statute requiring a statement of reasons is to be met.

On the original motion, all the court had before it from the wife concerning the husband's financial circumstances was a conclusory statement that he was "doing well". Against this, the court had the husband's account of business misfortune and resulting privation, and a clear indication that he wished neither to controvert any facts set forth in the wife's net worth statement nor to offer any financial facts of his own other than that he presently had neither income nor assets, except for the Manhattan apartment and East Hampton house jointly owned with the wife, and that he was deeply in debt and subsisting only with the assistance of his family. Given these circumstances, it is questionable whether, under the rule invoked by the court, there were any disputed facts as to which adverse inferences could be drawn; at best, it might have been proper to draw an inference in favor of the wife by finding as a fact that the husband was "doing well". But the court would not even commit itself to that, instead indicating only that it was drawing an inference favorable to the wife as to any and all financial issues.

On the original motion, the husband appeared *pro se,* claiming that he was unable to afford a lawyer, but that "[i]f the court believes it necessary, I will beg and borrow money to pay for a lawyer to help me defend myself in this action." As a *pro se* litigant, he showed considerable diligence and attentiveness to the lawsuit, submitting his opposing affidavit on time with apparently only about a week's notice of the return date. While the record, as the majority points out, does reflect that the husband had out-of-court advice from a lawyer, I would hesitate to conclude, as the majority appears to do, that he was given an opportunity by the court to submit a net worth statement after being told of the consequences for

failing to do so. The husband's affidavit of April 21, 1986, relied upon by the concurring Justice, was submitted in support of a separate motion by the husband seeking, among other things, dismissal of the action pursuant to CPLR 3012 (b) and 3211 (a) (7). Therein, the husband asserted that at the conference held on February 26, 1986 in connection with the wife's temporary maintenance motion, the law assistant conducting the conference "appeared to disregard the failure of [the wife] to serve a complaint and to emphasize the fact that I had not attached a separate form of net worth statement to my affidavit" in opposition to the temporary maintenance motion. Although the conference in question was not transcribed, it can be surmised that the law assistant might have refused to consider the husband's arguments because his papers in opposition, although devoting much space to the alleged failure to serve a complaint, were not formally denominated a cross motion; perhaps too, the law assistant was under instructions to discuss only financial matters. The law assistant's refusal to discuss what the husband viewed as a crucial threshold issue prompted the husband to write a letter to the Trial Judge the following day complaining that he was unable to raise points of concern to him at the conference and requesting that the action be dismissed pursuant to CPLR 3012 (b).

Upon the basis of such a description of what occurred at the conference and its immediate aftermath, I cannot draw any certain conclusions that the husband disregarded an opportunity given to him by the court to submit a net worth statement, or that he was obstreperous, dilatory or otherwise deserved to be treated as though he were in default on the temporary maintenance motion. That such was not the case is confirmed by the wife's own attorney who, in opposing the husband's motion for renewal or downward modification, stated that the husband had "fully detailed his financial circumstances" at the conference. Thus, it is not as if the husband was tight-lipped at the conference, stubbornly refusing to discuss financial matters until the nonfinancial, procedural, threshold matters he was raising had first been taken up. Overall, I am left with the impression that the husband indicated to the court a willingness to do whatever might be expected of him, and that he would have submitted a net worth statement had he been advised by the court that, notwithstanding the seeming simplicity of his current financial state, adverse inferences would be drawn against him as to his wherewithal to support his family unless a net worth statement was forthcoming.

While it is true that a motion for renewal generally should be based on newly discovered facts not available on the original motion, this rule is not inflexible, and the court has discretion to grant renewal even upon facts known to the moving party at the time of the original motion where it can fairly be said that the new matter was not raised because of an excusable mistake or inadvertence *(Parascandola v Kaplan,* 108 AD2d 738; *Patterson v Town of Hempstead,* 104 AD2d 975; *Olean Urban Renewal Agency v Herman,* 101 AD2d 712; *Esa v New York Prop. Ins. Underwriting Assn.,* 89 AD2d 865). Here, it was not so much a matter of the husband failing to raise facts known, as failing to adduce those facts in the officially prescribed form, and his purpose in moving for renewal was simply to correct this defect in his proof *(see,* 2A Weinstein-Korn-Miller, NY Civ Prac ¶ 2221.03). In the meantime, the circumstances of the parties had changed, in that they were no longer living together in the Manhattan apartment and both were now earning a regular income. These were plainly new facts arising subsequent to the original motion, and, as such, constituted some further justification for a reconsideration by the court of its original award (Domestic Relations Law § 236 [B] [9] [b]).

In urging that the trial court should have granted the husband's motion to renew or modify, and that he should be afforded an appellate remedy because it did not, I do not mean to suggest that we should abandon our oft-stated view that the proper remedy for inequities in a pendente lite award is not an appeal but a speedy trial. We have continued to express adherence to this policy even after the advent of equitable distribution with its inevitable delays incident to lengthy disclosure *(see, Besen v Besen,* 94 AD2d 637; *Getson v Getson,* 91 AD2d 540; *Tarantini v Tarantini,* 84 AD2d 697; *Braga v Braga,* 82 AD2d 727, *supra).* Here, however, it should be noted that the majority goes beyond a mere reference to the speedy trial rule, and preempts the trial court's control over its own calendar by itself setting a firm trial date.

I urge that the husband's motion to renew or modify should have been granted because the record made on that motion, considered in conjunction with the record made on the original motion, provides a basis for setting a realistic level of interim support, because of changed circumstances, because the husband's failure to submit a net worth statement should have been excused, and because the interim award was based on a faulty application of 22 NYCRR 202.16 (g) (4) (i). That rule permits the court to draw inferences as to disputed

financial facts; but what those facts are the trial court did not say, and its failure to do so requires us to either remand for a statement thereof or to make one ourselves (see, Chyrywaty v Chyrywaty, 102 AD2d 1009). The majority is similarly silent. The only fact it finds concerning the husband's financial state —that his business endeavors are prospering and that his future augurs well—is inferred from the circumstance that his income went from zero to $4,300 a month in the short period of time between the original and renewal motions. However, the husband's motion for renewal having been properly denied in the view of the majority, factual matter contained in the record made thereon ought not to be considered by them. Moreover, I do not think that the husband's present circumstances, as described in his renewal motion, support the majority's sanguine expectations as to his future, particularly in view of the heavy debt he amassed during the course of his business failure.

Turning to the merits, upon renewal, I would find that the husband has income of approximately $52,000 a year before taxes, or $4,333 a month; that the wife has income of approximately $26,000 a year before taxes, or $2,150 a month; that the only assets of substantial value owned by either of them are the Manhattan apartment and East Hampton house, both of which are heavily encumbered; that the earning capacity of the husband, while potentially greater than the wife's by a considerable degree, is uncertain; that the family's liabilities did for some time prior to the commencement of the action and at all times since substantially exceed its assets; and that the expense of the Manhattan apartment, amounting to $4,370 a month, is beyond the parties' means. I would find that in late 1985, the husband borrowed $42,500 from family members to support himself and his family. I would find that the husband paid the child's school tuition of $7,200 for the academic year 1985-1986, that tuition for the academic year 1986-1987 amounts to $3,600, and that the child has no other special needs. I would find that the cost of health insurance policies presently covering the wife and child is $290 a month.

Attempting to arrive at an accommodation between the wife's reasonable needs and the husband's financial ability to meet those needs (Hill v Hill, 121 AD2d 270, 271, supra), I would award the wife temporary maintenance of $1,200 a month and temporary child support of $800 a month, both retroactive to February 6, 1986, the date of her temporary maintenance and support motion. In addition, I would direct that the husband maintain all policies of health and life

insurance, and pay the child's tuition for the academic year 1986-1987. Altogether, this would amount to $2,590 a month, or 60% of the husband's before-tax income. I would be leaving the husband with $1,743 a month, or approximately $21,000 a year, to live on before taxes, and the wife with $4,590 a month, or approximately $55,000 a year, before taxes. I would be giving the husband no financial credit for the period of time that he was allegedly without any income whatsoever; nor would I be giving him credit for scraping together the $7,200 plus transportation costs needed to pay for the child's education during the 1985-1986 school year.

These figures do not represent an attempt to reach a definitive valuation of the husband's ability to pay, nor are they the result of an unquestioning acceptance of the husband's "draw" as the limit of that ability. On the contrary, I am giving considerable weight to an earning potential which, although not unimpressive in the long term, is hardly likely to be realized during the period that any interim order is to be in effect. And, notwithstanding the majority's citation to *Kay v Kay* (37 NY2d 632), it cannot be said of the husband's presentation of evidence that it tends to obscure rather than clarify his true economic status, or that it indicates ownership of capital assets that can be converted into income. His use of the word "draw" may not have been felicitous, but the point came across that his income is $4,333 a month. Because of equivocation by the husband on this point, I would also conclude that his business associates will continue to provide him with an office, but, beyond an office and $4,333 a month, I would find that his prospects depend entirely upon the success, by no means certain, of the new business he is attempting to start up.

The result I reach is meant primarily to reflect the fact that the parties simply are not able to afford the Manhattan apartment *(see, Orenstein v Orenstein,* 24 AD2d 753, *supra).* Of course, the husband's earning potential, as the wife's, can be adequately determined only after a trial, and the foregoing is not meant to indicate what level of support, if any, should be ultimately directed.

The majority places considerable emphasis on the fact that the action, as we write, is on the Trial Calendar. This fact, the majority states, "further militates" against "sweeping, and possibly irreversibly harmful, appellate modifications" at this time. The appeal was submitted on December 4, 1986. By letter dated March 26, 1987 addressed to the Justice presiding on this appeal, the wife's attorney advised that a note of issue

and certificate of readiness was filed on January 13, 1987. I question the propriety of going behind the record to rely on this letter for purposes other than to show that, by reason thereof, the controversy has been rendered academic and that the appeal should therefore be dismissed (see, 10 Carmody-Wait 2d, NY Prac § 70:283). Even if proper to consider the letter for other purposes, I question the relevance of trial imminence to the issue before us—whether the trial court's refusal to modify the interim award was an abuse of discretion.

I concur with the majority insofar as it affirms the trial court's denial of the husband's motion to dismiss for failure to state a cause of action. In support of the motion, the husband relied on the fact that the parties continued to reside together throughout the long period of time the wife was allegedly subjected to cruel and inhuman treatment by him. However, this does not necessarily mean that the wife has no cause of action for divorce on those grounds. Continued occupancy of the same residence is merely one fact, to be considered with others, in determining the merits of a cause of action for divorce based on cruel and inhuman treatment (Takagi v Takagi, 38 Misc 2d 476). Put otherwise, whether the wife has condoned the husband's alleged cruel and inhuman treatment is a question of fact that should await joinder of issue.

I disagree with the majority insofar as it affirms the trial court's denial of the husband's motion to dismiss the action pursuant to CPLR 3012 (b) for failure to serve a complaint within 20 days after demand therefor. The record shows that a summons without complaint was served on December 14, 1985, and that the husband served a demand for a complaint on December 18, 1985. Thus, the wife had until January 12, 1986 to serve a complaint. In support of the motion, the husband stated that the complaint, although containing a verification dated January 3, 1986, was not received by his attorney until April 1, 1986. In opposition, the wife's attorneys submitted an affidavit from an attorney in their office attesting to a mailing of the temporary maintenance motion on January 3, 1986, and an affidavit from a receptionist, also dated January 3, 1986, attesting to a second, separate mailing of the complaint "and related papers" on January 3, 1986. Why the complaint was apparently not made part of the temporary maintenance motion, but instead mailed separately on the same day, is not explained. Also in support of the motion, the husband asserted that he first received the temporary maintenance motion on January 16, 1986 when a copy

was left at the service desk of the Manhattan apartment. The notice did not include a return date, and the papers did not include a copy of the complaint although they did include a copy of the summons with notice. According to the wife's attorneys, a return date was not indicated because of confusion attendant upon the changeover to IAS. Accordingly, a second (and perhaps a third) notice of motion, returnable on February 6, was served on the husband, the date(s) and method(s) of such service being a matter in dispute. Although the husband's opposition to the temporary maintenance motion emphasized his nonreceipt of a complaint, the wife did not produce the complaint allegedly served on January 3rd at the court conference held on February 26. Yet other circumstances were put forward by the husband that might be relevant on a traverse, such as the fact that while the temporary maintenance motion is alleged by the wife to have been originally served on January 3, 1986, the net worth statement is dated January 9, 1986. Perhaps there is an innocent explanation for this discrepancy, but I would not deprive the husband the opportunity to make inquiry at a hearing.

While it is true that a properly executed affidavit of service raises a presumption of a proper mailing, and that a mere denial by the recipient that he ever received the allegedly served papers is insufficient to rebut the presumption (*Engel v Lichterman,* 62 NY2d 943; *see,* McLaughlin, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, 1987 Pocket Part, CPLR C2103:2, at 177), the husband here supports his contention with much more than mere denial.

Accordingly, insofar as the appeal is from the denial of the husband's motion pursuant to CPLR 3012 (b), I would hold it in abeyance pending a hearing and findings by the trial court on the question of whether the complaint was timely served, such hearing to be conducted after the case is called for trial. I would further direct that the trial proceed on the merits while the appeal pends, since the best interests of the child would be served by a prompt and final disposition of the matter. Also, even if the husband were to succeed in showing that the complaint was not timely served, it is extremely unlikely that the result should be a dismissal of the action in preference to the imposition of a monetary sanction. Jurisdiction was, after all, obtained upon service of the summons with notice, and it does not appear that the husband was irreparably prejudiced by the allegedly tardy service of a complaint. Given these circumstances, it is better that vindication of the

husband's rights under CPLR 3012 (b), if any, not delay the trial.